**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| EAGLE METAL PRODUCTS, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | Civil Action Number:  3:08-CV-00641–M |
| KEYMARK ENTERPRISES, LLC, | § | |
| KEITH DIETZEN, AUTOMATIC | § | |
| STAMPING, LLC, and | § | |
| WILLIAM H. BLACK, JR., | § | |
| | § | |
| Defendants. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court are Defendant Keith Dietzen's Second Motion to Dismiss [Docket Entry #109] and the Motion to Dismiss for Lack of Personal Jurisdiction jointly filed by Defendants Automatic Stamping, LLC ("Automatic") and William H. Black, Jr. ("Black") [Docket Entry #112].  Defendant Dietzen's Motion is **GRANTED IN PART** and **DENIED IN PART**.  The Motion of Automatic and Black is **GRANTED IN PART** and **DENIED IN PART**.

*Background*

Plaintiff V.P.T., Inc., now known as Eagle Metal Products ("VPT"), designs, manufactures and sells steel connector plates, which are a component of wood trusses.[1]  Wood trusses are used to build roofs on residential and commercial buildings.  VPT had a longstanding relationship with Defendant Keymark Enterprises, LLC ("Keymark"), which specializes in engineering design software used in construction.  VPT's customers are wood truss manufacturers, and they use computer assisted design programs created by Keymark to select

---

[1] VPT notified the Court that it changed its corporate structure on July 3, 2009.  To remain consistent with the Complaint and briefing, the Court will refer to the Plaintiff as VPT.

technical specifications and generate technical design drawings.  Keymark developed the version

of truss software currently in use by VPT's customers, and Keymark hosts the software on its

servers.  Keymark also controls VPT's access to the software.  The VPT-Keymark agreement is

reflected in a license dated August 2, 2004, which provides that the software will be "solely

licensed to Eagle as the only plate manufacturer in the United States"[2] ("Agreement"). VPT

claims that the software is vital to its business.  It contends that truss manufacturers will not buy

connector plates without having access to related truss software, and that a disruption in

availability of the Keymark software would be damaging to VPT's business.

In 2008, a dispute arose over who can use the truss software created by Keymark,

resulting in this litigation.  VPT sought injunctive relief, and on December 22, 2008, this Court

entered a preliminary injunction, granting some of the relief sought by VPT, by preventing

Keymark from limiting VPT's access to the websites hosting the software.  After the issuance of

the injunction, VPT filed its Third Amended Complaint ("the Complaint"), accusing Keymark

and its president, Keith Dietzen, of conspiring with a VPT competitor, Automatic, and its sole

member, William H. Black, to sell to Automatic the truss software, in violation of the

Agreement.  The Complaint alleges that Dietzen fraudulently misrepresented to VPT his

intentions about honoring the Agreement, and that he called VPT's customers and impugned

VPT's reputation, as part of an effort to convince them to buy Keymark/Automatic plates, rather

than VPT plates.

In the Complaint, VPT asserts thirteen causes of action against Dietzen individually,

claiming, among other things, that Dietzen defrauded VPT, defamed VPT, stole its trade secrets

and breached fiduciary duties to VPT.[3]  Dietzen has moved to dismiss under Fed.R.Civ. P.

---

[2] *See* ¶13.2.
[3] VPT asserts the following claims against Dietzen: promissory estoppel, fraud and fraudulent inducement, negligent

12(b)(2), claiming that the Court lacks personal jurisdiction over him.  VPT also claims

Automatic and Black engaged in a conspiracy with Keymark and Dietzen to interfere with VPT's

contract with Keymark and to misappropriate VPT's trade secrets.[4]  Automatic and Black have

also moved to dismiss under Fed. R. Civ. P. 12(b)(2).

*Legal Standard*

Personal Jurisdiction

A federal court sitting in diversity may exercise personal jurisdiction over a nonresident

defendant if the long-arm statute of the forum confers personal jurisdiction over that defendant,

and the exercise of such jurisdiction by the forum is consistent with due process.[5]  The Texas

long-arm statute reaches to the limits of due process, and therefore a court need only determine

whether the exercise of personal jurisdiction over the moving defendant is consistent with due

process.[6]  The Due Process Clause of the Fourteenth Amendment to the United States

Constitution permits the exercise of personal jurisdiction over a nonresident defendant when (1)

that defendant has purposefully availed itself of the benefits and protections of the forum state by

establishing "minimum contacts" with the forum state;[7] and (2) the exercise of jurisdiction over

that defendant does not offend "traditional notions of fair play and substantial justice."[8]

When personal jurisdiction is challenged, and no evidentiary hearing occurs, the party

seeking to invoke jurisdiction must make a *prima facie* showing of jurisdiction, with the court

---

misrepresentation, business disparagement, defamation and defamation per se, tortious interference, unjust
enrichment, misappropriation of trade secrets, unfair competition and reverse passing off under the Lanham Act,
common law unfair competition and misappropriation, and breach of fiduciary duty.

[4] VPT asserts the following claims against Automatic: tortious interference, quantum meruit, unjust enrichment,
misappropriation of trade secrets, common law unfair competition and misappropriation.  VPT asserts the same
claims against Black, except it does not bring a quantum meruit claim.

[5] *Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999); *Electrosource, Inc. v. Horizon Battery Tech., Ltd.*, 176
F.3d 867, 871 (5th Cir. 1999) (citing *Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex. 1990)).

[6] *Guardian Royal Exch. Assur., Ltd. v. English China Clays P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991).

[7] *See Burger King v. Rudzewicz*, 471 U.S. 462, 474 (1985).

[8] *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 867 (5th Cir. 2001).

resolving all disputed facts in favor of jurisdiction.[9] When determining whether the plaintiff has made a *prima facie* case, the court may consider any affidavits, interrogatories, deposition testimony, or any other recognized discovery method,[10] not considering conclusory allegations.[11]

There are two categories of personal jurisdiction, general and specific. General jurisdiction exists when a defendant's contacts with the forum state are "continuous and systematic," allowing the court to exercise jurisdiction over that defendant for causes of action unrelated to the defendant's connections to the state.[12] For specific jurisdiction to exist, the plaintiff's claim must arise out of or be related to those contacts.[13] In determining whether specific jurisdiction exists, the court must conduct the minimum contacts analysis separately for each cause of action.[14] If a plaintiff makes a *prima facie* case that minimum contacts exist, the defendant has the burden of demonstrating that the exercise of jurisdiction would offend traditional notions of fair play and substantial justice.[15] Under some circumstances where specific jurisdiction is claimed, the court may exercise jurisdiction over a non-resident defendant accused of committing tortious acts outside the state that had a harmful effect within the forum. Under the so-called "effects test," first formulated in *Calder v. Jones*,[16] "an act done outside the state that has consequences or effects within the state will suffice as a basis for jurisdiction in a suit arising from those consequences if the effects are seriously harmful and were intended or highly likely to follow from the nonresident defendant's conduct."[17] In *Calder*, the plaintiff, a

---

[9] *See Luv N' care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006).

[10] *Thompson v. Chrysler Motors Corp.*, 755 F.2d 1162, 1165 (5th Cir. 1985).

[11] *Panda Brandywine*, 253 F.3d at 869.

[12] *Mink v. AAAA Dev., LLC,* 190 F.3d 333, 336 (5th Cir. 1999); s*ee also Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 n.9 (1984).

[13] *See Burger King*, 471 U.S. at 472 (1985).

[14] *Stelax Indus. Ltd. v. Donahue*, No. 3:03-CV-923-M, 2004 WL 733844, at *2 (N.D. Tex. Mar. 25, 2004) (Lynn, J.).

[15] *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 211 (5th Cir. 1999).

[16] 465 U.S. 783, 789-90 (1984).

[17] *Id.*.

California actress, accused writers and editors of libeling her in a tabloid article published in Florida.  The United States Supreme Court concluded that the defendants knew that the harmful effects of the alleged libel would be felt by the plaintiff in California, and concluded that the defendants intentionally and expressly aimed their allegedly tortious conduct at California.[18] The Court noted that the "focal point" of the article was California, because the article was drawn primarily from California sources and it focused on an actress whose career was based in California.[19]  However, as the Fifth Circuit later clarified, the mere foreseeability that harm will be suffered by someone in the forum is insufficient.  The Fifth Circuit, quoting the Seventh Circuit, has stated that "the key to *Calder* is that the effects of an alleged intentional tort are to be addressed as part of the analysis of the defendant's relevant contacts with the forum."[20]

*Analysis*

Plaintiff does not assert that the Court may exercise general jurisdiction over the Defendants; therefore, the Court addresses only specific jurisdiction.[21]

**I.   Keith Dietzen**

Dietzen's Declaration affirms that he does not transact or solicit any personal business in Texas, does not contract in his personal capacity to provide services in, or sell goods in, Texas, has not caused a tortious injury in Texas, does not derive any substantial revenue from Texas, owns no personal property in Texas, and has not visited Texas in the last twenty-five years, except in his capacity as Keymark's CEO.

A.   Fiduciary Shield

Dietzen argues that the fiduciary shield doctrine shields him from suit in Texas, so long

---

[18] *Calder*, 465 U.S. at 789-90.
[19] *Id*. at 783.
[20] *Allred v. Moore & Peterson*, 117 F.3d 278, 286 (5th Cir.1997), *cert. denied*, 522 U.S. 1048 (1998) (quoting *Wallace v. Herron*, 778 F.2d 391, 395 (7th Cir. 1985), *cert denied*, 475 U.S. 1122 (1986)).
[21] *See* Plaintiff's Response Brief at 14.

as he did not receive any "personal benefit" from activities connecting him to Texas.  He cites the decision of a Texas intermediate court, *Tang v. Garcia*, for the proposition that the fiduciary shield doctrine prevents the exercise of personal jurisdiction over those "whose only purposeful availment of Texas's law was made as a corporate representative of his or her employer." [22]

The fiduciary shield doctrine does not prevent the exercise of personal jurisdiction over a person against whom tort claims are asserted.  In *Tang*, the plaintiff couched its claims against the individual defendants only in their capacities as agents for, and fiduciaries of, their employer, and did not assert that they were personally liable.  The opposite is true here—Plaintiff is suing Dietzen as an individual, not as an agent of Keymark.  The *Tang* court noted that "an agent is *not* protected from the exercise of specific jurisdiction if he engages in tortious or fraudulent conduct, directed at the forum state, for which he may be held personally liable."[23]  And as the Fifth Circuit has stated, due process is *not* offended "when a non-resident corporate agent or employee is made subject to personal jurisdiction in the forum state for a foreseeable consequence therein of his personal act performed elsewhere, although allegedly performed only as a corporate functionary."[24]  The fiduciary shield protects only contacts made as a corporate representative from being the basis for personal jurisdiction.  When a corporate official is sued personally for a tort, his liability is "not based on an exception to the fiduciary shield doctrine, but rather on the well-established principle that "a corporate officer is primarily liable for his own torts."[25]  In other words, Dietzen's role with Keymark does not shield him from liability for torts he is alleged to have committed.

---

[22] No. 13-06-00367-CV, 2007 WL 2199269, at *4 n.2 (Tex. App.—Corpus Christi Aug. 2, 2007, pet. denied).

[23] *Tang*, 2007 WL 2199269, at *4 n.2 (emphasis added).

[24] *Donovan v. Grim Hotel Co.*, 747 F.2d 966, 974 (5th Cir. 1984).  *See Stelax*, 2004 WL 733844, at *7 (N.D. Tex. Mar. 25, 2004) (Lynn, J.).

[25] *See XPEL Tech. Corp. v. Maryland Performance Works, Ltd.*, No. SA-05-CA-0593-XR, 2006 WL 1851703, at *10 (W.D. Tex. May 19, 2006) ("Although the Texas Supreme Court has not formally adopted the fiduciary shield doctrine, Texas courts of appeal have limited its application to the exercise of general jurisdiction.") (citing *Ennis v. Loiseau*, 164 S .W.3d 698, 707 (Tex.App.—Austin 2005, no pet.).

Dietzen next argues that the allegedly fraudulent and defamatory statements attributed to him are insufficient as a basis for personal jurisdiction.  He argues that dismissal is mandated by *Michiana Easy Livin' Country, Inc. v. Holten*,[26] where the Texas Supreme Court declined to exercise jurisdiction over a firm alleged to have made misrepresentations to a Texan about the sale of a recreational vehicle.  In *Michiana*, the Texas Supreme Court held that so-called "direct-a-tort" jurisdiction improperly focuses on the relationship between the plaintiff and the forum, rather than focusing on the relationship between the defendant and the forum.

The Court first notes that *Michiana* does not bind this Court.  The Texas long-arm statute reaches to the limits of federal due process, and thus this Court's inquiry is limited only by the Constitution of the United States.[27]  *Michiana* does not interpret Texas state law.  Instead, it expresses a view on the limits of federal due process.  Although the Court has read and analyzed *Michiana*, this Court must follow the law of the Fifth Circuit, which has frequently found a single act by a defendant sufficient to confer personal jurisdiction if that act gives rise to the claim being asserted,[28] including in cases where fraud is alleged.[29]

Further, the facts in *Michiana* are clearly distinguishable from this case.  In *Michiana*, the plaintiff called the defendant, an Indiana dealer doing business only in Indiana, to purchase a recreational vehicle from the dealership.  The plaintiff sent payment for the vehicle to Indiana, paid for delivery in Indiana, and agreed to resolve any disputes in Indiana.  Other than the one phone call, initiated by the plaintiff, the defendant had absolutely no interaction with Texas at all.

---

[26] 168 S.W.3d 777, 784 (Tex. 2005).

[27] *Revell v. Lidov*, 317 F.3d 467, 469-70 (5th Cir. 2002) ("Because Texas's long-arm statute reaches to the constitutional limits, we ask, therefore, if exercising personal jurisdiction over [the defendants] would offend due process.").

[28] *Lewis v. Frense*, 252 F.3d 352, 358 (5th Cir. 2001).

[29] *Wien Air Alaska*, 195 F.3d at 213 ("When the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment."); *see Stelax*, 2004 WL 733844, at *3-8 (exercising jurisdiction over non-resident defendants based on alleged fraudulent statements sent into jurisdiction); *accord Staton Holdings, Inc. v. Hilton Apparel Group*, No. 3-07-CV-0383-BD, 2007 WL 1964635, at *3-4 (N.D. Tex. July 5, 2007) (Kaplan, Mag. J.).

In this case, Dietzen, as president of Keymark, had a nearly twenty year relationship with VPT, which he knew was a Texas company, and he is alleged to have been part of an intricate conspiracy, through tortious conduct, to spoil VPT's relationship with its customers.

Accordingly, the Court will analyze Dietzen's contacts with Texas for each claim asserted, to determine whether he has minimum contacts with Texas. Once minimum contacts are established, the nonresident is required to make a "compelling case" against the court exercising personal jurisdiction.[30] Since Dietzen does not even claim the absence of fair play and substantial justice, he does not make such a compelling case, so if minimum contacts exist, jurisdiction may be exercised.

B. Tort Claims

### 1. Fraud & Fraudulent Inducement

VPT alleges that Dietzen knowingly sent fraudulent communications into Texas, while VPT representatives were in Texas, representing that he would continue to develop the software under the terms of the Agreement even though he had no intention of doing so. Taking those factual allegations as true, as the Court must for the purposes of the analysis, this allegation establishes minimum contacts for the exercise of personal jurisdiction over these claims, which all share the same factual basis. Under the law of this Circuit, even one fraudulent statement knowingly transmitted into the jurisdiction provides a basis for personal jurisdiction.[31] Accordingly, the Court has jurisdiction over the fraud and fraudulent inducement claims.

### 2. Negligent Misrepresentation

The negligent misrepresentation claim is based on Dietzen's alleged "material, false representations and/or non-disclosures to Eagle about Keymark and Dietzen's intentions and

---

[30] *Wien Air Alaska*, 195 F.3d at 215 (citing *Burger King*, 471 U.S. at 477)).
[31] *Id.* at 213.

good faith efforts to complete the software re-write."  VPT alleges that "Dietzen did not exercise reasonable care or competence in obtaining or communicating the false representations and/or non-disclosures to Eagle."

The Fifth Circuit has held that, in order for a negligent misrepresentation claim to provide the basis for personal jurisdiction, the claim must allege a misstatement of an "existing fact," and cannot relate to the future behavior of a defendant in continuing to honor an agreement.[32]  The negligent misrepresentation claim here is based on such an allegation.  Additionally, the conduct complained of cannot be a *negligent* statement of an existing fact, because Dietzen knew his own intentions when stating them to VPT.  In *Moncrief Oil International v. OAO Gazprom*, the Fifth Circuit refused to exercise personal jurisdiction over a virtually identical scenario, and the Court refuses to do so here.[33]

### 3.  Business Disparagement / Defamation / Defamation Per Se

VPT alleges that Dietzen defamed and disparaged VPT's business in statements to several VPT customers, including TUFF SHED, Inc.  Dietzen allegedly called representatives of TUFF SHED and said that VPT was cheating its customers, by intentionally misstating the weight of its steel truss plates, and thereby effectively overcharging.  The Complaint does not allege that the disparaging and defamatory statements were actually made to TUFF SHED representatives in Texas,[34] but VPT urges that, most of its business is conducted in Texas, with Texas-based customers, and therefore the harm to it is felt primarily in Texas.

The Court concludes that jurisdiction over Dietzen can be exercised under *Calder*.  It is reasonable to expect that the effect of the alleged disparagement and defamation would be felt in

---

[32] *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 481 F.3d 309, 314 (5th Cir. 2007).
[33] *See id.*
[34] VPT provides evidence that TUFF SHED has several manufacturing locations in Texas, but it is not specific about where the allegedly defamatory statements were made to it.

Texas, where VPT was principally doing business.  In *Mullins v. Testamerica, Inc.*,[35] the Fifth

Circuit addressed claims that the defendant had wrongfully appropriated a portion of a business's

assets, in violation of the Texas Uniform Fraudulent Transfer Act, and of interfering with a

contract executed in Texas and governed by Texas law.  As the defendant was "acutely aware"

that its conduct would thwart the plaintiff's claim to a portion of the proceeds involved, the court

held that the defendant "should reasonably have anticipated being haled into a Texas court for

precipitating and directing an alleged fraudulent transfer at the expense of a known, major

creditor in Texas whose right to payment arises out of contracts that share a strong connection

with Texas."[36]

　　　This case is analogous to the facts in *Mullins*.  VPT alleges that Dietzen called TUFF

SHED, one of VPT's biggest customers, and told TUFF SHED that VPT had been cheating

Keymark for years on its truss plate contract, and suggested that TUFF SHED might also have

been cheated, all with the alleged purpose of damaging VPT's relationship with TUFF SHED.

Like the defendant in *Mullins*, Dietzen was an "insider," having done business with VPT for

many years,[37] and Dietzen based the statements now alleged to be defamatory and disparaging on

his longstanding relationship with VPT, which he knew to be a Texas resident.  Like the

defendant in *Mullins*, Dietzen should have been "acutely aware" that any resulting harm to VPT

would be felt in Texas, and it was reasonably foreseeable that he would be haled into a Texas

court as a result.

### 4.  Tortious Interference / Unfair Competition

　　　The contracts allegedly interfered with by Dietzen are the Agreement between VPT and

---

[35] 564 F.3d 386 (5th Cir. 2009).

[36] *Id*. at 402.

[37] In *Mullins*, the defendant's "insider" status was wrongfully used to interfere with the relevant transaction; here, Dietzen's similar status would give greater weight to his allegedly defamatory statements.

Keymark, and contracts between VPT and its customers, such as TUFF SHED.  As a matter of law, Dietzen and Keymark cannot have interfered with the Agreement, because one cannot interfere with one's own contract.[38]  Here, Keymark was a party to the Agreement, and thus could not interfere with it, nor could Dietzen, its agent.  Thus, the only arguably actionable tortious interference claim against Dietzen relates to Dietzen's alleged interference with VPT's contracts with its customers.

Because the tortious interference claim relating to customer agreements is based on Dietzen's allegedly defamatory statements to customers such as TUFF SHED, the same rationale that applies to the defamation claim applies here.  Dietzen is charged with knowledge that any harm to VPT from such conduct would be felt in Texas, and *Calder* thus vests jurisdiction in this Court.

The common law unfair competition claim is based on the allegation that "Defendants committed one or more illegal acts that interfered with [VPT's] ability to conduct its business, including [VPT's] ability to market and sell steel connector plates.  One or more of Defendants' illegal acts constitute independent torts, including fraud, business disparagement, defamation, and tortious interference."  The analysis for the common law unfair competition claim is identical to the tortious interference claim, defamation and disparagement claims above, and the Court has jurisdiction over this claim as well.

### 5.  Misappropriation of Trade Secrets

VPT claims Keymark and Dietzen stole VPT's customer lists and distributed them to VPT's competitors, Automatic and Black, who then used the lists to solicit VPT's customers.  Dietzen is charged with knowing that the harm to VPT from this alleged conduct would be felt in

---

[38] *Holloway v. Skinner*, 898 S.W.2d 793, 794-95 (Tex. 1995).

Texas.  The Court thus has jurisdiction over the misappropriation claim under the effects test.[39]

**6.  Unfair Competition and Reverse Passing Off under the Lanham Act**

The Lanham Act claims arise out Keymark and Dietzen's alleged modification of the software's identifying mark.  Keymark and Dietzen allegedly changed the mark on the software to show it was copyrighted by Keymark, rather than VPT, thereby allegedly causing market confusion or mistake about the origin and ownership of the software.  VPT alleges that "Keymark's and Dietzen's actions are likely to cause confusion or mistake as to the origin of the TrueBuild Software . . . . [and] deprive Eagle of the advertising value of its name, the advertising value of the TrueBuild Marks, and the goodwill that would accrue if the public were aware that [VPT] is the true source of the TrueBuild products."

In *Luv N' care, Ltd. v. Insta-Mix, Inc.*,[40] the Fifth Circuit addressed the circumstances in which a defendant's actions constitute minimum contacts for purposes of Lanham Act claims.  The plaintiff, a Louisiana corporation that manufactured baby bottles, sued its competitor, a Colorado corporation, alleging that the defendant had copied the design of the cap of one of the plaintiff's bottles.  The defendant distributed its bottles through an agreement with Wal-Mart, and pursuant to that agreement, Wal-Mart transported the bottles "free on board" from the defendant's dock in Colorado Springs to one of its twenty-six national distribution centers, including to a distribution center in Louisiana.  The court stated that "[w]here a defendant knowingly benefits from the availability of a particular state's market for its products, it is only fitting that the defendant be amenable to suit in that state."[41]  Even though the defendant transferred control of the products in Colorado, and only 4.5% of its total revenues were derived

---

[39] *See Stelax*, 2007 WL 733844, at *4 (exercising personal jurisdiction over trade secret misappropriation claim where secrets were learned in the course of phone calls to Texas).
[40] 438 F.3d 465 (5th Cir. 2006).
[41] *Id*. at 470.

from shipments that, as a result of Wal-Mart's decisions, were sent to Louisiana, the court held that Louisiana had personal jurisdiction over the claim. The court stated that "Insta-Mix should have known, when it availed itself of the Louisiana market for infant care products, that it could face potential liability with similarly-designed items."[42]

Here, Dietzen allegedly solicited business on behalf of Keymark, in Texas, utilizing the allegedly confusing software. The Court concludes that as Dietzen sought to benefit from the availability of the Texas market for TrueBuild software, Dietzen should have known that he could face potential liability in Texas, and accordingly the Court has personal jurisdiction over the claim.

### 7. Breach of Fiduciary Duty

The breach of fiduciary duty claim arises out of an alleged fiduciary relationship developed over the twenty-year course of the VPT/Keymark relationship. VPT asserts that "Dietzen and Keymark violated their fiduciary duties to Eagle by [re]formatting and distributing the Wood Truss Software . . . [and] further violated their fiduciary duties to Eagle by failing to disclose the fact that they planned to format and distribute the Wood Truss Software for use with plates manufactured by Eagle competitors."

In Texas, a fiduciary relationship exists when "the parties are under a duty to act for or give advice for the benefit of another upon matters within the scope of the relationship." While the relationship may be formal or informal, "[a]part from formal fiduciary relationships, like those found in partnerships and trusts, courts have found business relationships giving rise to informal fiduciary relationships . . . only where prior dealings between the parties establish it.

---

[42] *Id*. at 473. The court also held that "This reasoning applies with equal force to Luv n' care's claims of trademark dilution and unfair competition under the Lanham Act, which in fact instructs the court, when deciding whether to issue an injunction to protect the trademark owner, to consider, inter alia, "the degree of recognition of the mark in the trading areas and channels of trade used by the mark's owner and the person against whom the injunction is sought." 15 U.S.C. § 1125(c)(1)(F)." *Id*. at 473 n.16.

The relationship must pre-date the contract giving rise to the suit."[43]  In addition, "a fiduciary relationship is an extraordinary one and will not be lightly created; the mere fact that one subjectively trusts another does not, alone, indicate that he placed confidence in another in the sense demanded by a fiduciary relationship . . ."[44]  The relationship between VPT and Keymark was governed by the Agreement, and the complained of conduct relates to Dietzen's performance of the Agreement on behalf of Keymark.  For the Court to exercise personal jurisdiction over the claim, it is insufficient for VPT to make the bare assertion that such a fiduciary duty exists, without supporting facts.  The Court will dismiss this claim against Dietzen, although VPT may attempt to replead to identify the source of his alleged fiduciary duty to VPT.

### 8.  Conspiracy and Unjust Enrichment

In Texas, civil conspiracy is defined as "a combination of two or more persons to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means."[45]  In Texas, conspiracy allegations, if shown, may extend liability beyond the primary actor to others who agreed to act towards a common goal.[46]  Dietzen's participation in the alleged conspiracy is premised on his alleged agreement with Automatic and Black to commit torts over which the Court has personal jurisdiction, such as the interference with VPT's customer relationships, defamation, and fraud.  The same contacts establish a *prima facie* case for jurisdiction with respect to the conspiracy theory of liability.[47]

VPT also advances an unjust enrichment theory and seeks a return of any monies gained

---

[43] *Breckenridge Enters. Inc. v. Avio Alternatives, LLC*, 3:08-CV-1782-M, 2009 WL 1469808, at *8. (discussing Texas law).

[44] *Id.*, (citing *Stephanz v. Laird*, 846 S.W.2d 895, 901 (Tex.App.-Houston [1 Dist.], 1993, writ denied)).

[45] *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996).

[46] *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.3d 922, 925 (Tex. 1979).

[47] *Stelax*, 2004 WL 733844 at *6.

through the commission of the tortious conduct alleged.  In Texas, a plaintiff may recover under

an unjust enrichment theory when the defendant "has obtained a benefit . . . by fraud, duress, or

the taking of an undue advantage."[48]  While there is considerable disagreement about whether

unjust enrichment stands as an independent cause of action,[49] where, as here, a plaintiff has pled

causes of action underlying the unjust enrichment claim that provide jurisdiction, there is also

jurisdiction over the plaintiff's unjust enrichment theory of recovery.[50]

C.  Quasi-contract claims

1. **Promissory Estoppel**

The promissory estoppel claim is of a different order from the tort claims.  Promissory

estoppel is a quasi-contract theory, which seeks to hold a party responsible for promises that

induced justifiable reliance on another.[51]  This cause of action applies when a contract does not

exist, but equity compels enforcement of the promise.[52]  Dietzen's interaction with VPT over the

Agreement was in his representative capacity, and he did not make quasi-contractual promises as

an individual.  He is not a signatory to the Agreement between VPT and Keymark, and the

promises were made in and around the Agreement.  Just as Dietzen cannot be held personally

liable on the Agreement, he cannot be held liable for the same conduct if the Agreement is found

---

[48] *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41-42 (Tex. 1992).

[49] *See Biliouris v. Sundance Res., Inc.*, 559 F. Supp. 2d 733, 739-40 (N.D. Tex. 2008) (Godbey, J.) (recognizing confusion); *see also Baisden v. I'm Ready Productions, Inc.*, 2008 WL 2118170 at *10 (S.D. Tex. May 16, 2008) (holding that unjust enrichment is not an independent cause of action under Texas law and collecting cases), *but see Newington Ltd. v. Forrester*, 2008 WL 4908200, at *3-4) (N.D. Tex. Nov. 13, 2008) (Fish, J.) (holding that unjust enrichment *is* an independent cause of action and collecting cases).  *Compare Pepi Corp. v. Galliford*, 254 S.W.3d 457, 460 (Tex.App.—Houston [1st Dist.] 2007, pet. struck) ("Unjust enrichment is an independent cause of action." (citing *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 891 (Tex.1998) (analyzing a claim for unjust enrichment on its merits))) *with Argyle Indep. Sch. Dist. v. Wolf*, 234 S.W.3d 229, 246 (Tex.App.—Fort Worth 2007, no pet.) ("Unjust enrichment, itself, is not an independent cause of action . . . .").

[50] *Nations AG II, LLC v. The Hide Co.*, No. Civ.A.3:04-CV-0511-K, 2004 WL 1496312, at *2-4 (N.D. Tex. June 30, 2004) (Kinkeade, J.); *see Tellis Software Inc. v. PokerTek, Inc.*, No. G-07-00072, 2007 WL 2314316 (S.D. Tex. Aug. 10, 2007).

[51] *See Kelly v. Rio Grande Computerland Group*, 128 S.W.3d 759, 769 (Tex.App.—El Paso 2004, no pet.).

[52] *Bailey v. City of Austin*, 972 S.W.2d 180, 193 (Tex.App.—Austin 1998, pet. denied).

to be unenforceable.[53]  There are not jurisdictional contacts tying Dietzen to Texas on the

contract or quasi-contract theories.[54]  The Court does not have personal jurisdiction over the

promissory estoppel claim against Dietzen, and it will be dismissed.

## II.  Automatic and Black

VPT makes the following factual allegations about Automatic and Black:

- Dietzen and Black met in 2006, and Black told Dietzen he planned to re-enter the wood truss connector plate business, and that he wanted to use Keymark software.

- Dietzen and Black reviewed the VPT/Keymark Agreement and decided that Black and Automatic would indirectly license the software through a scheme in which Keymark would refer truss manufacturers interested in plates to Automatic, and Automatic would refer truss manufacturers who needed software to Keymark.[55]

- Automatic and Black referred several customers seeking truss software to Keymark.

- Keymark shared VPT's customer lists, gained through the Agreement, with Automatic and Black, thereby facilitating Automatic's efforts to steal VPT's customers.

- Black and Dietzen agreed that Keymark would take steps to end its relationship with VPT, thereby allowing Automatic to directly license the software.

In support of their Motion, Automatic and Black presented the following evidence: (1)

Automatic is a North Carolina limited liability company, with one location in Edenton, North

Carolina.  (2) Black is Automatic's sole member and manager, and is a North Carolina resident.

(3) Automatic has no registered agent in Texas, and does not send salespeople to develop

business in Texas, negotiate contracts in Texas, or service Texas accounts.  (4) Neither

Automatic nor Black have property in Texas, an ownership interest in a Texas company, Texas

---

[53] *See Fertic v. Spencer*, 247 S.W.3d 242, 250 (Tex.App.—El Paso 2007, pet. denied).

[54] *See Stangel v. Jonhson & Madigan PLLP*, 228 F.3d 409, at *1 (5th Cir. 2000) (unpublished) (affirming dismissal of promissory estoppel claim for lack of personal jurisdiction where defendant attorney, through his law firm, communicated with plaintiff in Texas regarding legal bills); *Mesa Agriproducts, Inc. v. Olabi Int'l, S.A.*, No. H-07-1336, 2007 WL 2777773 (S.D. Tex. Sep. 6, 2007) (dismissing promissory estoppel claim along with contract claim where contract did not provide minimum contacts).

[55] The Complaint states that Automatic would refer customers seeking software to Automatic, but the Court concludes that VPT means to say that Automatic would refer its customers to Keymark.

addresses, or bank accounts or employees in Texas.  (5) Automatic makes all of its sales "free on board" Edenton, North Carolina, and does not ship any goods into Texas.  (6) Neither Automatic nor Black has visited Texas in connection with the allegations underlying this suit.

### A.  Conspiracy Jurisdiction and Direct Actions

VPT's main theory as to how this Court may exercise personal jurisdiction over Automatic and Black is its claim that the Court can properly consider the contacts of all the members of an alleged conspiracy when determining whether personal jurisdiction can be asserted over each member.  Plaintiff's position is that, if a plaintiff provides more than bare allegations of a conspiracy and presents evidence of the alleged co-conspirators' acts in or directed at Texas, then a court may properly attribute the contacts of each conspirator to other conspirators for the purposes of the jurisdictional inquiry.[56]

In *Delta Brands, Inc. v. Danieli Corp.*,[57] the Fifth Circuit rejected the plaintiff's claim that an alleged conspiracy between a Swedish company and an Italian company to obtain the plaintiff's confidential information allowed the court to impute each defendant's jurisdictional contacts to the other defendants.  The Fifth Circuit held that, for the plaintiff to establish a *prima facie* case of specific jurisdiction, it "was required to demonstrate that [the defendant] individually, and not as part of the conspiracy, had minimum contacts with Texas."[58]  And as this Court recently stated, "[e]ven with allegations of a conspiracy, the Court must still evaluate each of the Defendants' contacts separately to determine whether personal jurisdiction exists."[59]  Accordingly, VPT must demonstrate a basis for asserting jurisdiction over Automatic and Black,

---

[56] Plaintiff's Response at 18.
[57] *Delta Brands, Inc. v. Danieli Corp.*, 99 Fed. Appx. 1 (5th Cir. 2004) (unpublished).
[58] *Id*. at *5.
[59] *Weinberg v. National Football League Players Ass'n,* No. 3:06-CV-2332-B, 2008 WL 4808920, at *5 (N.D. Tex. Nov. 5, 2008) (Boyle, J.).

based on their own conduct.[60]  The Court rejects VPT's argument that it can exercise personal

jurisdiction over Automatic and Black by imputing the conduct of Keymark and Dietzen to them.

VPT makes the following allegations in further support of jurisdiction over Automatic

and Black:

- Black's daughter, on Black's behalf, sent an email to a truss manufacturer, quoting Automatic's prices and stating "Regarding software, we are using Keymark Enterprises, LLC."

- Keymark sent an email to Black's daughter asking her to notify Black that Keymark was putting together an "implementation/training plan" for Southeastern Materials, one of Automatic's customers.  VPT claims that this shows that Keymark worked with Automatic to facilitate use of Keymark software in furtherance of the indirect licensing scheme.

- Automatic has solicited business from a VPT customer, Piedmont Truss, which pairs steel connector plates with a Keymark license, allegedly demonstrating that Keymark and Automatic are working together.

- On August 12, 2008, a Keymark salesman e-mailed Automatic, copying Black's daughter, and stated that it was apparent that Keymark and Automatic could be more effective in mutual marketing and sales efforts if they worked more closely together throughout the sales cycle.

- Automatic shipped at least 28 truckloads of plates to Texas locations of Stark Truss, a Texas company, and Keymark asked Stark Truss to use Keymark software, although the effort was unsuccessful.

- Automatic hired an engineer to help adapt Keymark software for use by Automatic.

The allegations above do not demonstrate that Automatic or Black had any direct contact

with Texas related to their challenged conduct.  None of their alleged conspiratorial behavior

occurred in Texas.  Automatic's shipments to Texas for Stark Truss[61] did not use Keymark

software, and there is no allegation that Automatic or Black asked Stark Truss to use Keymark

software in violation of the Agreement; rather, Dietzen wrote Stark Truss to offer use of

---

[60] *Delta Brands*, 99 Fed. Appx. 1, at *5.
[61] Automatic disputes that it shipped plates into Texas, as its sale was FOB North Carolina.

Keymark software.  VPT has failed to identify actions of Automatic and Black in Texas that can subject them to suit here.

## B. Effects Jurisdiction

However, the unavailability of conspiracy jurisdiction does not end the inquiry.  If VPT has identified a basis for jurisdiction under the effects test, the exercise of jurisdiction may nevertheless be proper, despite the absence of direct conduct of Automatic and Black in Texas. In *Central Freight Lines, Inc. v. APA Transport Co.*,[62] the plaintiff and defendant were freight delivery companies that had entered into a contract allowing each firm access to the other's freight lines, to expand the geographical reach of both.  With its new nationwide reach, the plaintiff, a Texas company, contracted with Dell Computers, also a Texas company, to ship computers from west Texas to the northeastern United States.  The defendant, a New Jersey company, allegedly overcharged plaintiff, and plaintiff brought a tortious interference claim for damage done to its relationship with Dell.  The Fifth Circuit found personal jurisdiction over the defendant on the tortious interference claim, because Texas was the plaintiff's home state, and, as the defendant knew, it was the primary location of plaintiff's business relationship with Dell Computers, and it was thus reasonably foreseeable that defendant would be sued in Texas for interference with such a relationship.[63]

In contrast, in *Panda Brandywine Corp.*, the Fifth Circuit found there was not personal jurisdiction over a defendant in Texas for tortious interference with the financing arrangements for a Maryland power generating plant, because defendant's allegedly tortious interference had "no relation to Texas other than the fortuity that [the plaintiffs] reside[d] there."[64]  Similarly, in

---

[62] 322 F.3d 376 (5th Cir. 2003).
[63] *Id*. at 383.
[64] 253 F.3d 865, 869 (5th Cir. 2001).

*Southmark Corp. v. Life Investors, Inc.*,[65] the Fifth Circuit rejected specific jurisdiction asserted

under *Calder*, when the damaged contractual relationship was negotiated outside Texas,

contemplated no performance in Texas, was not governed by Texas law, and pertained to the sale

of stock of a company that had no connection with Texas.  Recently, in *Mullins*, the Fifth Circuit

explained that, in analyzing a tortious interference with contract claim "we determine whether

the alleged tortfeasor expressly aimed his out-of-state conduct at the forum state by examining

the nexus between the forum and the injured contractual relationship."[66]

1. <u>"Primary" torts: Tortious Interference, Misappropriation of Trade Secrets, Common Law Unfair Competition and Misappropriation, and Quantum Meruit</u>

Here, Dietzen allegedly made Automatic and Black aware of the longstanding

relationship between VPT and Keymark, and Automatic and Black allegedly engaged in a

concerted plan with Dietzen and Keymark to unlawfully take VPT's software and customers,

using a purloined customer list of VPT.  The lynchpin of personal jurisdiction over tort claims is

that the defendant can reasonably foresee that it will be haled into the forum state to answer for

tortious activity, and the alleged conduct would put Automatic and Black on notice that they

could eventually be held to account in Texas for harming VPT, even if the tortious acts were

committed elsewhere.[67]  Accordingly, the effects test supports jurisdiction over the

misappropriation of trade secrets and common law unfair competition claims, as those claims

complain of the theft of VPT's software and customer lists, the focal point of the injury being in

Texas.  The Court also has personal jurisdiction over Automatic and Black for the claimed

interference with the Agreement, as Texas is VPT's home state, the primary location of VPT's

business and the focal point of its injury, making it more than fortuitous that jurisdiction over

---

[65] 851 F.2d 763, 772-73 (5th Cir. 1988).
[66] *Mullins*, 564 F.3d at 402.
[67] *See Calder*, 465 U.S. at 789 (holding defendant subject to personal jurisdiction in California based on foreseeable effects of libelous conduct committed in Florida); *See Central Freight*, 322 F.3d at 383.

such acts would be in Texas.[68]

However, the claim alleging interference by Automatic and Black with business between VPT and its other customers is different.  VPT has not contended that Automatic or Black made any false or fraudulent statements to any VPT customers.  The fraudulent statements complained of were made by Dietzen to VPT in promising to finish the software.  The alleged defamatory and disparaging comments VPT complains of were made by Dietzen to TUFF SHED, and there is no allegation that Automatic or Black made any such statements, or directed Dietzen to make them.  Indeed, VPT has not brought causes of action against Automatic and Black for business disparagement or defamation.  There is also no allegation that Black or Automatic sought to induce a breach of a contract between VPT and its other customers; rather, VPT alleges that Black and Automatic sought to acquire business that would otherwise go to VPT.  Essentially, other than through the theory that jurisdictional contacts can be imputed to co-defendants, which the Court rejects based on the authority cited above, VPT has failed to present a *prima facie* case of personal jurisdiction over the claim that Automatic and Black schemed to interfere with VPT's contracts with its customers.

VPT also brings a quantum meruit claim against Automatic,[69] alleging that Automatic received the benefits of the extra work performed by VPT under the Agreement, and by "indirectly licensing the Keymark software, while not paying [VPT] for the work."  In Texas, quantum meruit is appropriate only where the plaintiff provides valuable services *specifically for* the defendant, not merely where the services benefitted the defendant.[70]  VPT has not alleged such conduct here.  Accordingly, VPT cannot maintain a cause of action for quantum meruit

---

[68] *See Central Freight*, 322 F.3d at 382-84.  *Cf. Panda Brandywine Corp.*, 253 F.3d at 869-70.
[69] The claim is also brought against Keymark, which is not a movant here.
[70] *Truly v. Austin*, 744 S.W.2d 934, 937 (Tex. 1988) ("To recover in quantum meruit, the plaintiff must show that his efforts were undertaken *for* the person sought to be charged; it is not enough to merely show that his efforts benefitted the defendant.") (emphasis in original).

against Automatic under the facts alleged in the Complaint, and the Court refuses to assert

personal jurisdiction over such a claim.  With respect to Automatic, this claim is dismissed.

   2.  <u>Derivative Theories of Liability: Unjust Enrichment and Conspiracy</u>

Because the Court found that it has personal jurisdiction over all of the claims against

Automatic and Black, except for quantum meruit and alleged interference with VPT's

relationships with its customers, the derivative theories of unjust enrichment and conspiracy may

also proceed.[71]

**III. Fees and Costs**

Finally, VPT requests fees and costs associated with defending Dietzen's Motion to

Dismiss pursuant to 28 U.S.C. 1927, which states:

> Any attorney or other person admitted to conduct cases in any court of the United
> States or any Territory thereof who so multiplies the proceedings in any case
> unreasonably and vexatiously may be required by the court to satisfy personally
> the excess costs, expenses, and attorneys' fees reasonably incurred because of
> such conduct.

VPT has not proven that Dietzen's Motion to Dismiss was unreasonable or vexatious.

The Court concludes that the Motion was not filed in bad faith, and an award of fees and costs

under the statute is inappropriate.

*Conclusion*

For the reasons stated above, the Motions to Dismiss are **GRANTED IN PART** and

**DENIED IN PART**.  The Court has personal jurisdiction over all claims against Dietzen except

the negligent misrepresentation, breach of fiduciary duty, and promissory estoppel claims, which

are dismissed for lack of personal jurisdiction.  The Court has personal jurisdiction over

Automatic and Black for tortious interference with the Agreement, and claims of

misappropriation of trade secrets and unfair competition, including any related claim of unjust

---

[71] *See Stelax*, 2004 WL 733844, at *4-7.

enrichment.  The other claims against Automatic and Black are **DISMISSED** for lack of

personal jurisdiction.

      **SO ORDERED**.

      August 17, 2009.

      **BARBARA M. G. LYNN**
      **UNITED STATES DISTRICT JUDGE**
      **NORTHERN DISTRICT OF TEXAS**